## IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JOHN H. BENGE, JR. | § | |
| | § | NO. 137, 2004 |
| Defendant Below, | § | |
| Appellant, | § | |
| | § | |
| v. | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| STATE OF DELAWARE | § | in and for New Castle County |
| | § | Cr. ID. No. 0301005493 |
| Plaintiff Below | § | |
| Appellee. | § | |

Submitted: October 13, 2004
Decided: November 12, 2004

Before **STEELE**, Chief Justice, **Holland** and **Berger**, Justices.

ORDER

This 12th day of November, 2004, on consideration of the briefs of the parties, it appears to the Court that:

1)  John H. Benge, Jr., appeals from his conviction, following a guilty plea, of two counts of burglary third degree, three counts of unlawful interception of communications (wiretapping), and one count of attempted wiretapping. Benge argues that his three year prison sentence for the first wiretapping offense violated his constitutional right to trial by jury.

2)  Benge admitted that he illegally entered his former wife's home, and installed a recording device in order to eavesdrop on her. He entered his guilty plea on these charges three months after being sentenced on several violent felony charges, which also involved his former wife and her boyfriend. After hearing from the victim and Benge, the Superior Court sentenced Benge outside the SENTAC guidelines because it found "a lack of remorse, among other matters."

1

3) Benge's sole argument on appeal is that, under the holding in *Blakely v. Washington*,[1] the trial court violated his constitutional right to a trial by jury because it exceeded the SENTAC sentencing guidelines. In *Blakely*, the United States Supreme Court invalidated a sentence that exceeded the "standard range" but not the statutory maximum term for the crime. The governing state sentencing scheme required courts to find "substantial and compelling reasons" before imposing an "exceptional sentence" (one that exceeds the standard range), and provided appellate review of the record in support of the trial court's findings. *Blakely* invalidated the exceptional sentence because it exceeded the maximum sentence that could be imposed based solely on a jury verdict.

4) *Blakely* does not impact Delaware's sentencing scheme because the SENTAC guidelines are voluntary and non-binding. As we explained in *Siple v. State*. [2]

---

[1] 124 S.Ct. 2531 (2004).

[2] 701 A.2d 79, 82-83 Del. 1997)(Citations omitted).

2

On September 15, 1987, this Court issued Administrative Directive Number Seventy-Six. That directive implemented the sentencing guidelines that had been developed by SENTAC, and provided that:

> 2. Any judge who finds a particular sentencing standard inappropriate in a particular case because of the presence of aggravating or mitigating or other relevant factors need not impose a sentence in accordance with the standards but such judge shall set forth with particularity the reasons for the deviation...
>
> *          *          *
>
> 3. The sentencing standards are considered voluntary and nonbinding; thus no party to a criminal case has any legal or constitutional right to appeal to any court a statutorily authorized sentence which does not conform to the sentencing standards.

This Court's Administrative Directive...requires that reasons be given for deviations from SENTAC's sentencing guidelines because this Court does have appellate jurisdiction to review criminal sentences on the basis of alleged: unconstitutionality; factual predicates which are either false, impermissible, or lack minimum indicia of reliability; judicial vindictiveness, bias, or sentencing with a "closed mind;" and any other illegality. Except for these constitutional and legal constraints, it is well-established that appellate review of criminal sentences is limited in Delaware to a determination that the sentence is within the statutory limits. Delaware, unlike the federal and several state jurisdictions has not provided for appellate review of criminal punishments that deviate from sentencing guidelines.

Thus, the trial court must explain its reasons for doing so, but it is authorized to exceed the SENTAC guidelines without making any factual findings beyond those reflected in the jury's verdict.

3

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court be, and the same hereby is, AFFIRMED.

BY THE COURT:

/s/ Carolyn Berger
Justice

IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| WARD T. EVANS, | § | |
| | § | No. 67, 2004 |
| Defendant Below, | § | |
| Appellant, | § | Court Below:  Superior Court of |
| | § | the State of Delaware in and for |
| v. | § | Kent County |
| | § | |
| STATE OF DELAWARE, | § | Cr. I.D. No. 88K01678DI |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: September 22, 2004
Decided:    November 23, 2004

Before **STEELE**, Chief Justice, **HOLLAND**, **BERGER** and **JACOBS**, Justices, and **HARTNETT**, Justice (Retired),[1] constituting the Court *en Banc*.

Upon appeal from Superior Court. **REVERSED and REMANDED.**


Ward T. Evans, Smyrna, Delaware; *Pro Se* Appellant.

Loren C. Meyers and Gregory E. Smith, Esquires, Deputy Attorneys General, Department of Justice, Wilmington; for Appellee.

*Per Curiam*:

---

[1] Sitting by designation pursuant to DEL. CONST. art. IV, § 38 and DEL. CODE ANN. tit. 29, § 5610(a)(2) (2001) and DEL. SUPR. CT. R. 2, 4.

The defendant below, Ward T. Evans, appeals from an order of the Superior Court denying his motion for correction of an illegal sentence. We reverse the Superior Court's denial of Evans' motion and remand the case to the Superior Court for a determination of whether Evans has earned any good behavior or merit credits, and for a recalculation of Evans' conditional release date consistent with our holding that Evans' life sentence should be considered a 45-year term.

### *Facts*

On September 29, 1982, a jury convicted Evans of first degree rape. Evans was sentenced to life in prison with the possibility of parole. The status sheet completed by the Department of Corrections did not give Evans a conditional release date. Rather, it listed Evans' maximum release date as "death" and recites his maximum sentence, less good time, as "life."

In 1993, 1996 and 1999, the Board of Parole denied Evans' requests for parole. On January 8, 2004, Evans filed a motion with the Superior Court, claiming that his sentence was illegal. Evans argued that under the conditional release statute he was entitled to have a conditional release date calculated as if his life sentence were a 45-year term.

The Superior Court denied Evans' motion, and Evans appealed. On appeal Evans maintains that this Court's decision in *Crosby v. State*[2] requires that his life

---

[2] 824 A.2d 894 (Del. 2003).

sentence be calculated as a 45-year term for purposes of determining his qualification for conditional release. We agree.

### The Proper Term of Years for Calculating Evans' Conditional Release Date

Evans' appeal presents issues of statutory interpretation, which this Court reviews *de novo*.[3] As long as a sentence falls within the statutory maximum, an order of the Superior Court denying a motion for modification of that sentence is reviewed for abuse of discretion.[4]

Under Superior Court Rule 35(a), a defendant is entitled to have an illegal sentence corrected at any time. Evans argues that his sentence, as applied by the Department of Corrections, is illegal, because it does not provide a conditional release date. Evans urges that the conditional release statute[5] incorporates the definition of a life sentence that is set forth in the parole statute,[6] and that under that latter definition, his life sentence must be fixed as a 45-year term for purposes of calculating his conditional release date.

Sections 4346 and 4348 of Title 11 establish the rules for the parole and the conditional release of inmates. For purposes of determining eligibility for parole,

---

[3] *State v. Lewis,* 797 A.2d 1198, 1199 (Del. 2002); *Jackson v. Multi-Purpose Criminal Justice Facility,* 700 A.2d 1203, 1205 (Del. 1997).

[4] *Lewis,* 797 A.2d at 1202; *Mayes v. State,* 604 A.2d 839, 842-43 (Del. 1992).

[5] 11 *Del. C.* § 4348.

[6] 11 *Del. C.* § 4346.

2

Section 4346(c) expressly states that a life sentence should be considered "a fixed term of 45 years." Section 4348 provides that an inmate is entitled to conditional release at the expiration of the maximum term sentenced, less any merit and good time credits earned. Although Section 4348 contains no separate definition of "life sentence," it does provide that a person conditionally released shall "be deemed as released upon parole."

Evans contends that Section 4348 incorporates Section 4346(c)'s definition of a life sentence as a 45-year term. In 1997, in *Jackson v. Multi-Purpose Criminal Justice Facility*, this Court held that Section 4348 did not incorporate the 45-year term defined by Section 4346. In 1998, however, we expressly overruled that holding in *Crosby v. State*, in which we held that Sections 4346(c) and 4348 must be read *in pari materia*, and that as so read, Section 4348 incorporates Section 4346(c)'s definition of a life sentence as a 45-year term.

We noted in *Crosby* that Sections 4346 and 4348 were enacted at the same time and are contained in the same chapter of the Delaware Code. Section 4346(c) provides that a life sentence must be considered as a 45-year term for purposes of both determining eligibility for parole under Section 4346(a) and accelerating that eligibility through merit and good behavior credits. Section 4348 provides that an inmate's conditional release date can be accelerated by merit and good behavior credits, and that conditional release shall "be deemed as on parole." On that basis,

3

we conclude that Section 4348 incorporates Section 4346(c)'s definition of a life sentence as a fixed 45-year term.[7]

Our ruling in *Crosby* controls Evans' life sentence. As such, that sentence is illegal because Evans' maximum release date does not reflect that 45-year term. Although the State urges us to limit our holding in *Crosby* to felons sentenced under the habitual offender statute, there is no principled way to read *Crosby* in that manner. Although the defendant in *Crosby* was sentenced under the habitual criminal statute,[8] our holding with respect to Sections 4346(c) and 4348 did not in any way turn on that fact.

We limit our holding in this case to crimes committed before June 30, 1990, the effective date of the Truth in Sentencing Act of 1989. That Act prospectively eliminated good time credits for inmates serving a life sentence imposed for a Class A felony.[9] As we recognized in *Crosby*, by eliminating such good time credits, the General Assembly intended that a life sentence imposed for Class A felonies would no longer be considered a term of 45 years, but rather would be a

---

[7] *Crosby*, 824 A.2d at 899.

[8] 11 *Del. C.* § 4214.

[9] 11 *Del C.* § 4381(a).

4

natural life sentence.[10]   The Truth in Sentencing Act does not control Evans'

sentence, however, because the crime for which he was sentenced was committed

before June 30, 1990.   Accordingly, Evans is entitled to have his conditional

release date accelerated by whatever good time credits he has earned or may earn

in the future.

Both parties raise the issue of whether Evans has earned any good time or

merit credits.[11]   The record does not contain sufficient information to permit a

calculation of Evans' good time or merit credits.   On remand, the Superior Court

shall address that issue, so that any credits earned by Evans will be applied to the

45-year term so as to advance his conditional release date.

### *Conclusion*

For the foregoing reasons, the Superior Court's order refusing to modify

Evans' sentence was erroneous.   The judgment of the Superior Court is therefore

reversed and this matter is remanded to the Superior Court for a determination of

---

[10] *Crosby*, 824 A.2d at 900.   The General Assembly, by amending the Delaware Code in this manner, impliedly recognized that before the amendments a life sentence was not for a person's natural life, but rather for a 45-year term.

[11] 11 *Del. C.* § 4382 (1987) allows an inmate to earn good behavior ("good time") credits when he has not been guilty of any violation of discipline or any rules of the Department of Corrections. 11 *Del. C.* § 4384 (1987) allows an inmate to earn merit credits by participating in rehabilitation programs offered by the Department of Corrections. Section 4384 was repealed by 67 Del. Laws, c. 130, effective July 17, 1989, and the provisions for "good time" credits are now contained in Section 4381.

5

whether Evans has earned any good time or merit credits, and for an appropriate adjustment of his "maximum release date."

IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| WARD T. EVANS, | § | |
| | § | No. 67, 2004 |
| Defendant Below, | § | |
| Appellant, | § | Court Below – Superior Court |
| | § | of the State of Delaware, |
| v. | § | in and for Kent County |
| | § | Cr. ID. No. 88K01678DI |
| STATE OF DELAWARE, | § | |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: March 16, 2005
Decided: April 11, 2005

Before **STEELE**, Chief Justice, **HOLLAND, BERGER, JACOBS** and **HARTNETT**,[1] Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court. **AFFIRMED**.

James Brendan O'Neill, Esquire, Bernard J. O'Donnell, Esquire and James D. Nutter, Esquire, Assistant Public Defenders, Wilmington, Delaware, for appellant.

Loren C. Meyers, Esquire, Gregory E. Smith, Esquire and Kim E. Ayvazian, Esquire, Department of Justice, Wilmington, Delaware, for appellee.

Thomas J. Allingham, II, Esquire, Skadden, Arps, Slate, Meagher & Flom, Wilmington, Delaware, amicus curiæ.[2]

***Per Curiam***:

---

[1] Sitting by designation pursuant to Del. Const. art. IV, § 38 and Del. Code Ann. tit. 29, § 5610(a)(2) (2001) and Del. Supr. Ct. R. 2, 4.
[2] This Court appointed Mr. Allingham to act as amicus curiæ. We appreciate his *pro bono* professional services.

This is an appeal from a final judgment of the Superior Court. In an opinion issued by this Court on November 23, 2004, that judgment was reversed. As a matter of Delaware law, however, our prior decision in this proceeding did not become final.

During the pendency of this appeal, House Bill No. 31[3] was enacted by the General Assembly and signed into law by the Governor, although the Governor questioned its constitutionality.[4] House Bill No. 31 declares the November 23, 2004 decision in this specific proceeding "null and void," directs this Court generally on matters of statutory construction, and states that the "General Assembly asserts its right and prerogative to be the ultimate arbiter of the intent, meaning, and construction of its laws." In this opinion, we hold that House Bill No. 31 is unconstitutional in its entirety. That legislation, therefore, has no bearing on our reconsideration of the merits of Evans' appeal.

The question presented in this appeal is whether the life sentence currently being served by Evans makes him eligible for release from incarceration *only* if parole is granted. The answer depends upon whether

_____

[3] 75 Del. Laws, c. 1, § 1.
[4] In a letter requesting the Justices' opinions concerning the constitutionality of House Bill No. 31, the Governor stated: "I question the constitutionality and enforceability of several provisions of the bill." As a result of this decision, that request becomes moot.

2

Evans' life sentence is controlled by this Court's holding in *Jackson v. State*[5] or by our holding in *Crosby v. State*.[6] We conclude that Evans' life sentence is controlled by the holding in *Jackson*. Therefore, unless he is granted parole, Evans is not eligible for release from incarceration prior to his death.

In this opinion, we reconsider our prior decision. Although *en Banc* opinions are not withdrawn frequently, it does happen occasionally.[7] We have concluded that the opinion issued by this Court on November 23, 2004, must be withdrawn. We have also concluded that the judgment of the Superior Court must be affirmed.

*Facts*

On September 29, 1982, a jury convicted Evans of Rape in the First Degree. Evans was sentenced to life in prison with the possibility of parole. The status sheet completed by the Department of Correction did not give Evans a conditional release date. Rather, it listed Evans' maximum release date as "death" and recites his maximum sentence, less good time, as "life."

In 1993, 1996 and 1999, the Board of Parole denied Evans' requests for parole. On January 8, 2004, Evans filed a motion for post-conviction

---

[5] *Jackson v. Multi-Purpose Criminal Justice Facility*, 700 A.2d 1203 (Del. 1997).
[6] *Crosby v. State*, 824 A.2d 894 (Del. 2003).
[7] *See Haas v. United Tech. Corp.*, 450 A.2d 1173 (Del. 1982) (prior *en Banc* opinion withdrawn); *Pathe Indus., Inc. v. Cadence Indus. Corp.*, 425 A.2d 952 (Del. 1981) (prior *en Banc* opinion withdrawn). *Compare Gondek v. Pan Am. World Airways, Inc.*, 382 U.S. 25, 26 (1965) (reopening a final judgment in the interests of justice).

3

relief in the Superior Court, claiming that his sentence was illegal. Evans argued that under the conditional release statute in existence when his crimes were committed, he was entitled to have a conditional release date calculated as if his life sentence were a term of forty-five years.

The Superior Court denied Evans' motion. It did so without any analysis and without issuing an opinion. The Superior Court's ruling is simply a checked box on a preprinted form. Evans then appealed.

On appeal, Evans argues that this Court's decision in *Crosby v. State*[8] requires that his life sentence be calculated as a forty-five year term for purposes of determining his qualification for conditional release. In its initial answering brief with this Court, the State admitted that Evans' argument was correct. Thereafter, this Court granted the State's motion to withdraw that brief, after which the State filed a "Substituted Answering Brief," now arguing that Evans' case is controlled by this Court's decision in *Jackson v. State*.[9]

As earlier noted, our opinion of November 23, 2004 did not become final. We later decided to reconsider that opinion and asked the parties to file supplemental memoranda. Unfortunately, despite the serious issues presented in this case, the State initially failed to address one of our

---

[8] *Crosby v. State*, 824 A.2d 894 (Del. 2003).
[9] *Jackson v. Multi-Purpose Criminal Justice Facility*, 700 A.2d 1203 (Del. 1997).

4

inquiries, and we directed the State to file a complete response.    The
supplemental briefing is now concluded.

### House Bill No. 31

House Bill No. 31 declares that the November 23, 2004 decision of
this Court in this very proceeding to be "null and void."[10]  House Bill No. 31
also declares that the Delaware Constitution "vests authority and sole
responsibility for lawmaking in the General Assembly."   House Bill No. 31
further provides that "the General Assembly asserts its right and prerogative
to be the ultimate arbiter of the intent, meaning, and construction of its laws,
and to vigorously defend them."[11]

### Separation of Powers

The defining principle of the American constitutional form of
government is separation of powers.[12]  In the United States, the foundation
for both our national and state governments are three separate branches – the
legislative, executive, and judicial, each coordinate and in the main

---

[10] *See* House Bill No. 31, Section 1, § 5402.
[11] *Id.*
[12] *See* M.J.C. Vile, *Constitutionalism and the Separation of Powers* 1-175 (1967); and
William B. Gwyn, *The Meaning of the Separation of Powers* (Tulane Studies in Political
Science, IX [New Orleans, 1965]).  *See also*, John A. Fairlie, *The Separation of Powers*,
21 Mich. L. Rev. 393-436 (1922); Malcolm P. Sharp, *The Classical American Doctrine
of "The Separation of Powers*," 2 U. Chi. L. Rev. 385-436 (1935); B.F. Wright, Jr., *The
Origins of the Separation of Powers*, 13 Economica 169-85 (1933); William S.
Carpenter, *The Separation of Powers in the Eighteenth Century*, 22 Amer. Pol. Sci. Rev.
32-44 (1928); Francis G. Wilson, *The Mixed Constitution and the Separation of Powers*,
15 Sw. Soc. Sci. Q. 14-28 (1934-35).

independent of the others.[13]  As the United States Supreme Court stated over one hundred years ago:

> It is believed to be one of the chief merits of the American system of written constitutional law, that all powers intrusted to government, whether State or national, are divided into the three grand departments, the executive, the legislative, and the judicial.    That the functions appropriate to each of these branches of government shall be vested in a separate body of public servants, and that the perfection of the system requires that the lines which separate and divide these departments shall be broadly and clearly defined.    It is also essential to the successful working of this system that the persons intrusted with power in any one of these branches shall not be permitted to encroach upon the powers confided to the others, but that each shall by the law of its creation be limited to the exercise of the powers appropriate to its own department and no other.[14]

The American tripartite system of separating governmental authority was the result of a combination of historical experience and contemporary political theory.  The desirability of dividing the power of government into three main divisions is traceable to numerous philosophers beginning with Aristotle.[15]  The more immediate influences on colonial America, however, were philosophers such as Charles Montesquieu,[16] Jean Jacques Rousseau,[17]

---

[13] John A. Fairlie, *The Separation of Powers*, 21 Mich. L. Rev. 393 (1922).
[14] *Kilbourn v. Thompson*, 103 U.S. 168, 190 (1880).  M.J.C. Vile, *Constitutionalism and the Separation of Powers* 13 (1967).
[15] In his *Politics*, based on his study of Athens and other Greek city states, Aristotle identifies three main governmental agencies:  the general assembly, deliberating upon public affairs; the public officials; and the judiciary.  Book IV, ch. 14, *cited in* John A. Fairlie, *The Separation of Powers*, 21 Mich. L. Rev. 393, 393 (1922).
[16] *See* Baron De Montesquieu, *The Spirit of the Laws* (Thomas Nugent trans., 1949).
[17] *See* Paul M. Spurlin, *Rousseau in America*, 1 French-American Review 8-16 (1948).

and John Locke;[18] and English common law scholars like Edward Coke, Henry deBracton, and William Blackstone.[19]   In advising against the concentration of governmental power, Montesquieu wrote:

> When the legislative and executive powers are united in the same person, or in the same body of magistracy, there can be then no liberty . . . .  Again, there is no liberty, if the power of judging be not separated from the legislative and executive powers.   Were it joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control; for the judge would be then the legislator.   Were it joined to the executive power, the judge might behave with all the violence of an oppressor.  There would be an end to everything, were the same man, or the same body, whether of the nobles or of the people, to exercise those three powers, that of enacting laws, that of executing the public resolutions, and of trying the causes of individuals.[20]

These principles – derived from philosophies and theories of political science – were well known to American statesmen in 1776.  Because separation of powers was generally considered by American colonists to be a fundamental maxim of proper government, its absence under the English rule of King George III eventually became intolerable and led to the American Revolution.

---

[18] John Locke, *The Second Treatise of Government* §§ 221, 243 (T. Peardon ed., 1952).
[19] Daniel A. Farber & Suzanna Sherry, *A History of the American Constitution* 6 (1990). 1 William Blackstone, *Commentaries on the Laws of England* 150-51 (a Facsimile of the First Edition of 1765-69 by University of Chicago Press 1979).
[20] Baron De Montesquieu, *The Spirit of the Laws* n. 39.

***First State Constitutions***

The Declaration of Independence was the catalyst that elevated the separation of powers doctrine into what is now known as "a first principle of free government."[21]    The Declaration of Independence expressed the concerns that required "dissolv[ing] the political bands" with England. Those concerns included interference with the judicial process by the King and Parliament, by: obstructing "the Administration of Justice by refusing his Assent to Laws for establishing Judiciary Powers;" making "Judges dependent on his will alone, for the tenure of their offices, and the amount and payment of their salaries;" and "depriving us in many cases of the benefits of Trial by Jury."

Independence from England meant that each of the former colonial states became a new sovereign entity. In 1776, that status required each colonial state to draft its own constitution. The framers of the first state constitutions had lived under a system of intermingled legislative and judicial powers.  In the 17th and 18th centuries colonial legislatures in America functioned as courts of equity of last resort, by either hearing

---

[21] Philadelphia *National Gazette* (Gaillard Hunt, ed., Feb. 6, 1792), quoting VI *The Writings of James Madison* 91 (N.Y., 1900-10).  William B. Gwyn, *The Meaning of the Separation of Powers* (Tulane Studies in Political Science IX [New Orleans 1965]).

8

original actions or providing appellate review of judicial judgments.[22] Often, however, those hybrid legislative and judicial assemblies decided to inject themselves into the judicial process by enacting special bills.    It was common for such legislation to nullify the judicial judgment in a particular case.[23]

The first state constitutions reflect the desirability of separating the legislative from the judicial power, prompted by royal and legislative interference with judgments of the American colonial courts.    Notably, Delaware's 1776 Constitution[24] and all of the other first state constitutions, provided for the same three departments.    Six of those constitutions contained a general clause expressly allocating the powers of government among these three branches – the legislative, executive, and judicial. Although the specific provisions varied, the legal result reflected in each of the first state constitutions was the same:  to define the sovereign power with

---

[22] Gordon S. Wood, *The Creation of the American Republic 1776-1787*, 154-55 (1969).

[23] M. Clarke, *Parliamentary Privilege in the American Colonies* 49-51 (1943).  *See, e.g., Judicial Action by the Provincial Legislature of Massachusetts,* 15 Harv. L. Rev. 208 (1902) (collecting documents from 1708-1709); 5 Laws of New Hampshire, *Including Public and Private Acts, Resolves, Votes, Etc.*, 1784-1792 (Metcalf ed. 1916); Robert Ludlow Fowler, *The Origin of the Supreme Judicial Power in the Federal Constitution,* 29 Am. L. Rev. 713 (1895).  *See also* 1 James Bradley Thayer, *Cases on Constitutional Law* 78 n.1 (Cambridge, Mass., George H. Kent ed., 1895); *Appeals from Colonial Courts to the King in Council, with Especial Reference to Rhode Island,* Ann. Rep. of the Am. Hist. Ass'n 299-350 (1894).

[24] *State ex rel. Biggs v. Corley*, 172 A. 415, 419 (Del. 1934).

9

precision and to restrain its exercise within marked boundaries.[25]

From 1776 until 1787, the doctrine of separation of powers was expanded and exalted to the foremost position in the American framework of constitutionalism.   By the 1780's many believed that the principle of separation of powers was "the basis of all free governments," the most important attribute of the kind of government for which they had fought the American Revolutionary War.[26]   According to Thomas Jefferson, "the powers of government should be so divided and balanced among several bodies of magistracy, as that no one could transcend their legal limits, without being effectually checked and restrained by the others."[27]   In a September 28, 1787 letter to John Adams, Jefferson wrote:   "The first principle of a good government is certainly a distribution of its powers into executive, judiciary, and legislative and a subdivision of the latter into two or three branches."[28]

---

[25] *See* Randy J. Holland, *State Constitutions: Purpose and Function*, 69 Temp. L. Rev. (1996).   *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 45 (1996) (Souter, J., dissenting) (citing *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 398-99 (1798) (Iredell, J., dissenting in part)).

[26] Portsmouth, *N.H. Gazette*, Mar. 15, 1783; Jefferson, *Notes on Virginia*, ed. Peden, 120. 3 Jefferson's Words (Ford ed., 1892), 424-25.

[27] Jefferson, *Notes on Virginia*, ed. Peden, 120.   3 Jefferson's Words (Ford ed., 1892), 424-25.

[28] 3 *Jefferson's Words* (Ford ed., 1892), 424-25.

10

### *United States Constitution*

At the time Jefferson wrote that letter to Adams, the United States Constitution was submitted to the states for ratification in 1787. A primary collective concern of the states was whether the proposed Constitution included strong provisions for separating the powers of government. The Federalist papers were written in defense of the proposed federal Constitution. They were published in 1787 and 1788 as the joint work of Alexander Hamilton, James Madison, and John Jay.

In an effort to give the states assurance during the ratification process, Federalist No. 81 explained that the proposed federal Constitution's formulation for separating the powers of government was modeled after many existing state constitutions. Indeed, Delaware's 1776 Constitution was cited as one of the model state constitutions for separating legislative and judicial powers:

> These considerations teach us to applaud the wisdom of those states, who have committed the judicial power in the last resort, not to a part of the legislature, but to distinct and independent bodies of men. Contrary to the supposition of those, who have represented the plan of the convention in this respect as novel and unprecedented, it is but a copy of the constitutions of New Hampshire, Massachusetts, Pennsylvania, Delaware, Maryland, Virginia, North-Carolina, South-Carolina

11

and Georgia; and the preference which has been given to these models is highly to be commended.[29]

### *Legislative Interference With Specific Cases Prohibited*

Federalist No. 81 also explained that the separation of powers in the proposed federal Constitution would preclude the national legislature from interfering with a "particular case," in exactly the same way that the state constitutions prohibited such legislative interference.

> A legislature without exceeding its province cannot reverse a determination once made, in a particular case; though it may prescribe a new rule for future cases. This is the principle, and it applies in all its consequences, exactly in the same manner and extent, to the state governments, as to the national government, now under consideration. Not the least difference can be pointed out in any view of the subject. [30]

Thus, in 1792, James Madison was describing the separation of powers doctrine as "a first principle of free government."[31]

That same year, Delaware adopted a new Constitution, after a convention over which John Dickinson presided.[32]    Under Dickinson's formulation, Delaware's 1792 Constitution again separated its powers of government by keeping them both "distinct in department" and "distinct in

---

[29] The Federalist No. 81, at 544-45 (Alexander Hamilton) (Jacob E. Cooke ed., 1961). *See also* The Federalist, Nos. 47-51 (James Madison).

[30] The Federalist No. 81, at 545 (Alexander Hamilton) (Jacob E. Cooke, ed. 1961).

[31] Philadelphia *National Gazette,* Feb. 6, 1792, VI *The Writings of James Madison* 91 (Gaillard Hunt, ed. N.Y.1900-10).

[32] *Claudio v. State,* 585 A.2d 1278, 1295 (Del. 1991).

12

office, and yet connected in operation."[33]   As Dickinson observed, "in a well-regulated state, judges ought to be equally independent of the executive and legislative powers."[34]

*Both federal and state judicial decisions*, in the first few decades after ratification of the United States Constitution and the adoption of Delaware's 1792 Constitution, reflect a consensus that the principle of separation of powers prohibited legislative interference with the judgments of American courts in specific cases.   In *Calder v. Bull*,[35] the Connecticut legislature had enacted a statute that set aside the final judgment of a state court in a civil case.   The sole issue before the United States Supreme Court was the construction of the *Ex Post Facto* Clause of the United States Constitution. Nevertheless, Justice Iredell, a leading Federalist who led the United States Constitution to ratification in North Carolina, noted:

> the Legislature of [Connecticut] has been in the uniform, uninterrupted, habit of exercising a general superintending power over its courts of law, by granting new trials.   It may, indeed, appear strange to some of us, that in any form, there should exist a power to grant, *with respect to suits depending or adjudged,* new rights of trial, new privileges of proceeding, not previously recognized and regulated by positive institutions

---

[33] *The Political Writings of John Dickinson* (1801).   John Dickinson, *Letters of Fabius, Pamphlets,* 182-83 (Ford, ed.).   Jefferson to John Adams, Sept. 28, 1787, Boyd, ed., *Jefferson Papers,* XII, 189; [John Dickinson], *Letters of Fabius,* Ford, ed., *Pamphlets,* 182-83; Wilson, "Lectures on Law," Wilson, ed., I *Works of Wilson* 435.   *In re Request of the Governor for an Advisory Opinion,* 722 A.2d 307 (Del. 1998).

[34] Randy J. Holland, *The Delaware State Constitution: A Reference Guide* 123 (2002).

[35] *Calder v. Bull,* 3 U.S. (3 Dall.) 386 (1798).

13

> *. . . . The power . . . is judicial in its nature*; and whenever it is exercised, as in the present instance, it is an exercise of judicial, not of legislative, authority.[36]

The decisions of the highest state courts during that period reflect the same understanding of the separation of powers. In *Bates v. Kimball*,[37] for example, a special act of the Vermont Legislature authorized a party to appeal from the judgment of a court even though the time for appeal had expired. The Vermont Supreme Court framed the question before it as: "Have the Legislature power to vacate or annul an existing judgment between party and party?"[38] The answer was unequivocal: "The necessity of a distinct and separate existence of the three great departments of government . . . had been proclaimed and enforced by . . . Blackstone, Jefferson and Madison," and had been "sanctioned by the people of the United States, by being adopted in terms more or less explicit, into all their written constitutions."[39] Citing the United States Supreme Court's decision in *Hayburn's Case*,[40] the Vermont Supreme Court held that the power to annul a final judgment was "an assumption of Judicial power," and,

---

[36] *Id.* at 398 (emphasis added).
[37] *Bates v. Kimball*, 2 D. Chip. 77 (Vt. 1824).
[38] *Id.* at 83.
[39] *Id.* at 84.
[40] *Hayburn's Case*, 2 U.S. (2 Dall.) 408 (1792).

14

therefore, forbidden.[41]

### Individual Cases Decided Under Judicial Power

Turning to the issue in this case, the constitutionality of House Bill No. 31, we start with the proposition that "the doctrine of separation of powers is integral to the fabric of the Delaware Constitution."[42] The history of Delaware "admits of no doubt that from the beginning our state government has been divided into the three departments, legislative, executive and judicial. It is likewise true that, generally speaking, one department may not encroach on the field of either of the others."[43]

In *Marbury v. Madison*, Chief Justice John Marshall observed that the United States Constitution "vests the whole judicial power of the United States in one supreme court, and such inferior courts as Congress shall, from time to time, ordain and establish."[44] Similarly, the Delaware Constitution vests the entire judicial power of our government exclusively in the judiciary. Article IV, § 1 of the Delaware Constitution provides: "The

---

[41] *Id.* at 90. *See also Merrill v. Sherburne*, 1 N.H. 199 (N.H. 1818) (legislature may not vacate a final judgment and grant a new trial); *Lewis v. Webb,* 3 Me. 326 (Me. 1825); T. Cooley, *Constitutional Limitations* 95-96 (1868) (collecting cases); J. Sutherland, *Statutory Construction* 18-19 (J. Lewis ed. 1904).

[42] *Joseph v. C.C. Oliphant Roofing Co.*, 711 A.2d 805, 808 (Del. Super. Ct. 1997).

[43] *Tr. of New Castle Common v. Gordy*, 93 A.2d 509, 517 (Del. 1952) (citations omitted). *See also Joseph v. C.C. Oliphant Roofing Co.*, 711 A.2d at 808.

[44] *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 173 (1803).

15

judicial power of this State shall be vested in a Supreme Court . . . and such other courts as from time to time by law [be] established."

The judicial function is to interpret the law and apply its remedies and penalties in particular cases.[45]  The judiciary has "the power, not merely to rule on cases but to decide them . . . with an understanding, in short, that 'a judgment conclusively resolves the case' because a "judicial power" is one to render dispositive judgments.'"[46]   In that regard, the Delaware Constitution specifically vests this Court with jurisdiction to hear appeals from the Superior Court in criminal causes and to determine all matters *finally*. Del. Const. Art. IV, § 11 so provides:

> The Supreme Court shall have jurisdiction . . . [t]o receive appeals from the Superior Court in criminal causes, upon application of the accused in all cases in which the sentence shall be death, imprisonment exceeding one month, or fine exceeding One Hundred Dollars, and in such other cases as shall be provided by law; and *to determine finally all matters of appeal on the judgments and proceedings of said Superior Court in criminal causes . . . .*[47]

The United States Supreme Court has held that the principal effect to be accomplished by the separation of legislative from judicial power is that "'[a] legislature without exceeding its province cannot reverse a

---

[45] John A. Fairlie, *The Separation of Powers*, 21 Mich. L. Rev. 393 (1922).
[46] *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218-19 (1995) (emphasis and citations omitted).
[47] Del. Const. art. IV, § 11 (emphasis added).

16

determination once made, in a particular case; though it may prescribe a new rule for future cases.'"[48] In 1868, the eminent constitutional scholar Thomas Cooley addressed precisely the question presented by House Bill No. 31:

> If the legislature cannot thus indirectly control the action of the courts, by requiring of them a construction of the law according to its own views, it is very plain it cannot do so directly, by setting aside their judgments, compelling them to grant new trials, ordering the discharge of offenders, or directing what particular steps shall be taken in the progress of a judicial inquiry.[49]

Summarizing the separation of powers principles in the United States, Professor Bernard Schwartz concludes:

> [D]eclaratory acts seeking to interpret earlier legislation and to give such interpretation retroactive effect are generally condemned. The legislature cannot set aside a construction of the law already applied by the courts in actual cases. As the high bench once put it, "To declare what the law is, or has been, is a judicial power; to declare what the law shall be, is legislative. One of the fundamental principles of all our governments is, that the legislative power shall be separated from the judicial." Similarly, the legislature cannot interfere directly in litigation. Thus, it cannot annul, set aside, vacate, reverse, modify, or impair the judgment of a competent court. It cannot compel the courts to grant new trials, order the

---

[48] *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. at 222 (quoting The Federalist No. 81 (Alexander Hamilton)).
[49] *Id.* at 225 (quoting Thomas Cooley, *Constitutional Limitations* 94-95 (1868) (collecting cases)).

17

discharge of offenders, or direct what particular steps shall be taken in a particular judicial proceeding.[50]

Every decision of the United States Supreme Court since its 1792 opinion in *Hayburn's Case* has uniformly held that such a legislative act exceeds the power of the legislature.[51]

House Bill No. 31 declares this Court's November 23, 2004 decision in this very proceeding (*Evans v. State*) is "null and void." Where retroactive legislation – such as House Bill No. 31 – requires its own application in a case already adjudicated, it "reverse[s] a determination once

---

[50] Bernard Schwartz, *A Commentary on The Constitution of the United States: The Powers of Government* 117 (1963) (quoting *U.S. v. South-Eastern Underwriters Ass'n*, 322 U.S. 533 (1944)).

[51] *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218-19 (1995). *See, e.g., Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948) ("Judgments within the powers vested in courts by the Judiciary Article of the Constitution may not lawfully be revised, overturned or refused faith and credit by another Department of Government"); *United States v. O'Grady*, 89 U.S. (22 Wall.) 641, 647-48 (1875) ("Judicial jurisdiction implies the power to hear and determine a cause, and . . . Congress cannot subject the judgments of the Supreme Court to the re-examination and revision of any other tribunal . . . ."); *Gordon v. United States*, 117 U.S. 697, 700-704 (1864) (opinion of Taney, C.J.) (judgments of Article III courts are "final and conclusive upon the rights of the parties"); *Hayburn's Case*, 2 U.S. (2 Dall.) 408, 411 (1792) (opinion of Wilson and Blair, JJ., and Peters, D.J.) ("[R]evision and control" of Article III judgments is "radically inconsistent with the independence of that judicial power which is vested in the courts"); *Id.* at 413 (opinion of Iredell, J., and Sitgreaves, D.J.) ("[N]o decision of any court of the United States can, under any circumstances, . . . be liable to a revision, or even suspension, by the [l]egislature itself, in whom no judicial power of any kind appears to be vested"). See also *Pa. v. Wheeling & Belmont Bridge Co.*, 59 U.S. (18 How.) 421, 431 (1856) ("[I]t is urged, that the act of congress cannot have the effect and operation to annul the judgment of the court already rendered, or the rights determined thereby . . . . This, as a general proposition, is certainly not to be denied, especially as it respects adjudication upon the private rights of parties. When they have passed into judgment the right becomes absolute, and it is the duty of the court to enforce it.").

18

made, in a particular case."[52]  That is constitutionally impermissible, because only the Delaware judiciary has the power, "province and duty . . . to say what the law is" in particular cases and controversies.[53]

The provision in section 5402 of House Bill No. 31, that declares this Court's decision in *Evans v. State* "null and void," is a legislative act that purports to exercise judicial power in a specific case.  As such, that provision in House Bill No. 31 violates Article IV, §§ 1 and 11 of the Delaware Constitution.[54]

### *Laws Interpreted Under Judicial Power*

House Bill No. 31 is unconstitutional in other respects as well.  The United States Supreme Court has recognized that the "essential balance" created by the separation of governmental authority in the existing state constitutions and the proposed United States Constitution "was a simple one. The Legislature would be possessed of the power to 'prescrib[e] the rules by which the duties and rights of every citizen are to be regulated,' but the power of '[t]he interpretation of the laws' would be 'the proper and peculiar

---

[52] The Federalist No. 81 at 545 (Alexander Hamilton) (Jacob E. Cooke ed., 1961).

[53] *State ex rel. Oberly v. Troise*, 526 A.2d 898, 905 (Del. 1987) (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 178 (1803)).

[54] *See State ex rel. Walker v. Harrington*, 27 A.2d 67, 72 (Del. 1942) (stating that "the jurisdiction of the Supreme Court is defined in the Constitution and that its jurisdiction cannot be impaired or restricted by language contained in any legislative act").

province of the courts.'"[55]  Accordingly, two hundred years ago, in *Marbury v. Madison*, the United States Supreme Court held:

> It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and *interpret* that rule. If two laws conflict with each other, the courts must decide on the operation of each . . . . *This is of the very essence of judicial duty.*[56]

House Bill No. 31 states that the General Assembly asserts its "right and prerogative to be the ultimate arbiter of the intent, meaning, and construction of its laws and to vigorously defend them." House Bill No. 31 also establishes specific standards for judicial officers to apply when interpreting or construing Delaware law. Those provisions in House Bill No. 31 attempt to confer upon the General Assembly fundamental judicial powers. Consequently, those provisions in sections 5402 and 5403 of House Bill No. 31 also violate Article IV of the Delaware Constitution.

### Single Subject and Title Provisions

House Bill No. 31 is unconstitutional for a third reason:  it addresses at least two distinct and separate subjects. The first subject is this Court's November 23, 2004 decision in *Evans v. State*, which House Bill No. 31

---

[55] *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 222 (1995) (quoting The Federalist No. 78 (Alexander Hamilton)).

[56] *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177-78 (1803) (emphasis added).  *See* Robert Lowery Clinton, *Marbury v. Madison and Judicial Review* (University Press of Kansas 1989).

purports to declare "null and void."[57]   The second subject is the establishment of prospective standards for the judicial interpretation and application of Delaware laws.[58]  These constitute two distinct and separate subjects of legislation.   The official synopsis of House Bill No. 31 so reflects, by addressing each subject in separate paragraphs:

> This bill declares the case of *Ward T. Evans v. State of Delaware* null and void . . . .
>
> The bill also established specific standards for judicial officers to use when interpreting or construing Delaware law.[59]

By combining two distinct and separate subjects in a single bill, House Bill No. 31 violates the single-subject provision of Article II, Section 16 of the Delaware Constitution.[60]

Article II, § 16 of the Delaware Constitution reads as follows:  "No bill or joint resolution, except bills appropriating money for public purposes, shall embrace more than one subject, which shall be expressed in its title."[61] The provision that a bill contain only one subject and that the title of the bill express its subject are distinct requirements having different historical

---

[57] House Bill No. 31, Section 1, §§ 5401-02.
[58] House Bill No. 31, Section 2, § 5403.
[59] House Bill No. 31, Synopsis.
[60] *Clendaniel v. Conrad*, 83 A. 1036, 1042 (Del. 1912) (legislation comprising "two distinct and separate subjects" violates the Single-Subject Provision).
[61] Del. Const. art. II, § 16 (the "Single-Subject Provision").

21

origins.[62]  Nevertheless, these two requirements are frequently combined in a single provision, such as Article II, § 16 of the Delaware Constitution, to achieve a common purpose.[63]

The potential problem caused by an omnibus bill is an uninformed legislative vote -- a problem recognized even by the Romans who, in 98 B.C., enacted the *Lex Caecilia Didia* to prohibit the adoption of laws which contained unrelated provisions -- the *lex satura*.[64]  The omnibus bill continued to be a cause for concern in colonial America prior to the Revolutionary War.[65]  Accordingly, the constitution of nearly every state now contains a general requirement that each legislative act be limited to a single subject.[66]

Almost every state constitution requires that the title of a bill adequately express its subject matter.[67]  These "title" provisions are also intended to insure informed legislative action, as the 1897 debates on the Delaware Constitution reflect:

> Oftentimes bills have been introduced in the Legislature with
> very harmless titles, but amendments have been added to those

---

[62] *See* Millard H. Ruud, *No Law Shall Embrace More Than One Subject*, 42 Minn. L. Rev. 389, 391 (1958).
[63] *Id.*
[64] *See* Luce, *Legislative Procedures* 548-49 (1922).
[65] *Id.*
[66] Millard H. Ruud, *No Law Shall Embrace More Than One Subject*, XLII Minn. L. Rev. 389, 390 (1958).
[67] *Id.*

22

bills and when they have passed both Houses, they are entirely different from what they were originally.[68]

The two general requirements of Article II, § 16 were included in the Delaware Constitution of 1897 in order to "prevent deception of the general public and the members of the General Assembly by titles to bills which give no adequate information of the subject matter of the bills."[69]  The single-subject and title provisions in Article II, § 16 are intended to assure sufficient notice that "legislation, the content of which was inadequately brought to the public attention, or so-called sleeper legislation" does not slip through the General Assembly.[70]  If a bill contains multiple subjects or the title of the bill would "trap the unwary into inaction," it violates Article II, § 16 of the Delaware Constitution.[71]

House Bill No. 31 graphically illustrates the dangers of an uninformed legislative vote where the title of a bill is inadequate.  This Court has always looked to the language of any statute when interpreting its provisions.[72]  Nevertheless, sections 5403(b) and (c) of House Bill No. 31 provided for judicial officers to "strictly interpret or construe legislative intent" and to "use the utmost restraint in interpreting or construing the laws of this State."

---

[68] 1 *Delaware Constitutional Debates 1897* 264.
[69] *Opinion of the Justices*, 194 A.2d 855, 856 (1963).
[70] *Id. See also* Randy J. Holland, *The Delaware State Constitution: A Reference Guide* 91 (2002).
[71] *In re the Opinion of the Justices*, 177 A.2d 205, 208 (1962).
[72] *See Hudson Farms, Inc. v. McGrellis*, 620 A.2d 215, 218-20 (Del. 1993).

23

House Bill No. 31 provided absolutely no notice, however, that it impacted

at *least sixty other statutes* in which the General Assembly stated that those

statutes must be *liberally or broadly construed* to accomplish the General

Assembly's intent, e.g., Del. Code Ann. tit. 19, § 721 in the Employment

Practices Act ("this subchapter shall be liberally construed to promote the

full employment opportunity of qualified handicapped persons who seek

such opportunity in good faith.").[73]

### House Bill No. 31 Entirely Unconstitutional

House Bill No. 31 contains a severability clause, which reads: "If any

provision of this Act or the application thereof to any person or circumstance

---

[73] *See also* Del. Code Ann. tit. 3, § 929; Del. Code Ann. tit. 3, § 3201; Del. Code Ann. tit. 3, § 9001; Del. Code Ann. tit. 3, § 10213; Del. Code Ann. tit. 5, § 3308; Del. Code Ann. tit. 6, § 1-103; Del. Code Ann. tit. 6, § 2512; Del. Code Ann. tit. 6, § 4201; Del. Code Ann. tit. 6, § 4501; Del. Code Ann. tit. 6, § 4601; Del. Code Ann. tit. 7, § 6020; Del. Code Ann. tit. 7, § 6404; Del. Code Ann. tit. 7, § 6423; Del. Code Ann. tit. 7, § 6501; Del. Code Ann. tit. 7, § 6619; Del. Code Ann. tit. 7, § 8001; Del. Code Ann. tit. 9, § 7001; Del. Code Ann. tit. 10, § 902; Del. Code Ann. tit. 10, § 1053; Del. Code Ann. tit. 10, § 1902; Del. Code Ann. tit. 10, § 6512; Del. Code Ann. tit. 10, § 7102; Del. Code Ann. tit. 10, § 9905; Del. Code Ann. tit. 11, § 2548; Del. Code Ann. tit. 11, § 4358; Del. Code Ann. tit. 11, § 6502; Del. Code Ann. tit. 11, § 6571; Del. Code Ann. tit. 12, § 2357; Del. Code Ann. tit. 12, § 4002; Del. Code Ann. tit. 13, § 401; Del. Code Ann. tit. 13, § 1502; Del. Code Ann. tit. 14, § 8201; Del. Code Ann. tit. 14, § 8213; Del. Code Ann. tit. 14, §9201; Del. Code Ann. tit. 16, § 921; Del. Code Ann. tit. 16, § 1421; Del. Code Ann. tit. 16, §5201; Del. Code Ann. tit. 16, § 6101; Del. Code Ann. tit. 17, §426; Del. Code Ann. tit. 18, § 3701; Del. Code Ann. tit. 18, § 4204; Del. Code Ann. tit. 18, § 4404; Del. Code Ann. tit. 20, § 3130; Del. Code Ann. tit. 21, § 2602; Del. Code Ann. tit. 21, § 8101; Del. Code Ann. tit. 22, § 1712; Del. Code Ann. tit. 22, § 1714; Del. Code Ann. tit. 22, § 1812; Del. Code Ann. tit. 22, §1901A; Del. Code Ann. tit. 24, § 2501; Del. Code Ann. tit. 24, § 5501; Del. Code Ann. tit. 25, § 7001; Del. Code Ann. tit. 26, § 801; Del. Code Ann. tit. 29, § 2517; Del. Code Ann. tit. 29, § 5067; Del. Code Ann. tit. 29, § 9007A; Del. Code Ann. tit. 31, § 381; Del. Code Ann. tit. 31, § 3601; Del. Code Ann. tit. 31, § 3821; Del. Code Ann. tit. 31, § 4002; Del. Code Ann. tit. 31, § 4014; Del. Code Ann. tit. 31, § 5203.

24