is held invalid, such invalidity does not affect other provisions or applications of the Act which can be given effect without the invalid provision or application, and, to that end, the provisions of this Act are severable." The purpose of the severability clause is to shield from invalidation any constitutional provisions of House Bill No. 31, if other provisions are declared unconstitutional.

Generally, a severability clause is enforceable.[74] *Each* of the separate substantive provisions in sections 5402 and section 5403 of House Bill No. 31, however, violates the requirement of separation of legislative and judicial powers in the Delaware Constitution. Moreover, a severability clause is unenforceable where, as in House Bill No. 31, the legislation collectively violates the single-subject provision in Article II, § 16.[75] If it were otherwise, the policy considerations served by the single-subject provision would be seriously undermined.[76] Accordingly, the severability clause does not shield any of the substantive provisions of House Bill No. 31 from invalidation.

---

[74] *See, e.g., Stiftel v. Malarkey*, 384 A.2d 9 (Del. 1977).
[75] *Clendaniel v. Conrad*, 83 A. 1036, 1042 (Del. 1912) (legislation comprising "two distinct and separate subjects" violates the Single-Subject Provision). *See also Heggs v. State*, 759 So.2d 620 (Fla. 2000); *Senate of Cal. v. Jones*, 988 P.2d 1089 (Cal. 1999); *Litchfield Elementary Sch. Dist. v. Babbitt*, 608 P.2d 792 (Ariz. Ct. App. 1980).
[76] Millard H. Rudd, *No Law Shall Embrace More than One Subject*, 42 Minn. L. Rev. 389, 399 n.8 (1958).

25

### *House Bill No. 31 Inoperative*

The State argues that "irrespective" of House Bill No. 31's constitutionality, this Court should consider it as a "clear declaration of legislative intent in the original act." That we cannot do. In *Marbury v. Madison*, the United States Supreme Court held "[i]t is a proposition too plain to be contested, that the constitution controls any legislative act repugnant to it."[77] Therefore, "an act of the legislature, repugnant to the constitution, is void."[78] After so concluding in *Marbury*, Chief Justice Marshall then asked the following questions:

> If an act of the legislature, repugnant to the constitution, is void, does it, notwithstanding its invalidity, bind the courts, and oblige them to give it effect? Or, in other words, though it be not law, does it constitute a rule as operative as if it was a law?[79]

The answer in *Marbury v. Madison* was a "resounding no."[80] To conclude otherwise would, in Chief Justice Marshall's words "subvert the very foundation of all written Constitutions . . . to restrict [legislative] powers within narrow limits."[81]

---

[77] *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).
[78] *Id.*
[79] *Id.*
[80] *Id.*
[81] *Id.* at 178.

26

Chief Justice Marshall's stirring answer is equally applicable here. House Bill No. 31 is unconstitutional in its entirety. Therefore, under *Marbury v. Madison*, it is void and can have no effect in our reconsideration of our November 23, 2004 decision issued in this case.

### Evans' Issue on Appeal

We next turn to the issue presented by Evans' appeal, which is whether his life sentence is for the term of his natural life (unless parole is granted), or for a term of forty-five years. The resolution of that question requires an overview of Delaware's statutory sentencing system.

### Original Statutory Sentencing System

The sentencing provisions of the Delaware criminal justice system appear in several different statutes, many of which were originally enacted separately and then amended on numerous occasions over the last few decades. Courts must read all of those statutes, as amended, *in pari materia* to interpret and give effect to the statutory sentencing scheme in operation at any given point in time.

In 1964, the General Assembly enacted sections 4346 and 4348 of Title 11. Section 4346 is entitled Eligibility for Parole. Subsection (a) provides: "A person confined to any correctional facility administered by the Department may be released on parole by the Board if the person has

27

served 1/3 of the term imposed by the court, such term to be reduced by such merit and good behavior credits as have been earned, or 120 days, whichever is greater."[82]  Subsection (c) also provides, in part: "For all purposes of this section, a person sentenced to imprisonment for life shall be considered as having been sentenced to a fixed term of 45 years."

Section 4348 of Title 11, which is entitled "Release Upon Merit and Good Behavior Credits" provides, in pertinent part: "A person having served that person's term or terms in incarceration, less merit and good behavior credits as having been earned, shall, upon release, be deemed as released on parole until the expiration of the maximum term or term for which the person is sentenced."  This Court has recognized that, insofar as the terms and conditions of non-custodial status are concerned, there is little practical difference between release on parole under section 4346 and conditional release under section 4348.[83]

Prior to 1990, an *eligible* inmate could obtain early release in two ways: from the Parole Board under section 4346(a) or by conditional release

---

[82] Section 4346 provides in relevant part:

(a)  A person confined to any correctional facility administered by the Department may be released on parole by the Board if the person has served 1/3 of the term imposed by the court, such term to be reduced by such merit and good behavior credits as have been earned, or 120 days, whichever is greater.  For the purpose of this subchapter, "court" shall include any court committing an offender to the Department.

[83] *Jackson v. Multi-Purpose Criminal Justice Facility*, 700 A.2d 1203, 1206 (Del. 1997).

28

pursuant to section 4348.[84]  *Release of an inmate on parole under section 4346 is a matter of discretion for the Parole Board.  Conditional release under section 4348, however, is non-discretionary.*  If an inmate who is eligible for conditional release has accumulated sufficient good behavior and merit credits, he or she must be released from incarceration on his or her short-term release date, *i.e.*, the maximum period of incarceration less accumulated good behavior and merit credits.[85]

### *Truth-in-Sentencing Act*

The most comprehensive legislative revision of the Delaware statutory sentencing system was the Truth-in-Sentencing Act of 1989, which became effective in 1990.  Under the Truth-in-Sentencing Act, a sentence of Level V incarceration for any crime committed after June 29, 1990 is no longer subject to the parole provisions of section 4346.  That is, beginning in 1990, the General Assembly prospectively abolished parole as a basis for early release from Level V incarceration for any post-June 29, 1990 crime.[86]

Although the 1989 Truth-in-Sentencing Act *completely eliminated parole* for crimes committed after its effective date, that statutory enactment continued generally to *permit conditional release* for good time credit.  The

---

[84] *Id.*
[85] *Id.*
[86] *Robinson v. State*, 584 A.2d 1203 (Del. 1991) ("The Truth-in-Sentencing Act was never intended by the Delaware General Assembly to have a retroactive effect.").

29

Truth-in-Sentencing Act thus provides that: "All sentences imposed for any offenses other than a life sentence imposed for class A felonies *may be reduced* by earned good time under the provisions of this section and rules and regulations adopted by the Commissioner of Corrections."[87] Thus, for crimes committed after June 29, 1990, the reduction of a sentence by earned good time would result in conditional release under section 4348 for eligible inmates.

### *Jackson Decision*

In *Jackson*, this Court confronted the same question that is presented by Evans on this appeal. Jackson, like Evans, was sentenced to life imprisonment, with the possibility of parole, before the enactment of Truth-in-Sentencing. The issue presented in *Jackson* was whether an inmate who is serving a life sentence with the possibility of parole is entitled to conditional release by the Department of Correction under Del. Code Ann. tit. 11, § 4348.

Jackson was sentenced in 1973 to two concurrent life terms in prison, with the possibility of parole, for Kidnapping in the First Degree and Rape in the First Degree. After his application for parole was denied in 1995, Jackson filed a petition for a writ of mandamus in the Superior Court.

---

[87] Del. Code Ann. tit. 11, § 4381(a).

30

Jackson claimed that the Department of Correction was required to set a conditional, or "short-term," release date for him under section 4348.

It was undisputed that for the purpose of determining Jackson's parole eligibility, the Parole Board was required to treat his life sentence as a fixed term of forty-five years.[88] Jackson argued, however, that the Department of Correction also was required to treat his life sentence as a fixed term of forty-five years for purposes of calculating a conditional release date. That is, Jackson, like Evans, asserted that, even if the Board denied him parole under section 4346, he was still entitled to conditional release by the Department of Correction under section 4348. In *Jackson*, we rejected that argument, and held that an inmate who is serving a life sentence with the possibility of parole is not entitled to conditional release under section 4348.[89] We stated that, if the General Assembly had intended to permit those inmates serving life sentences with the possibility of parole to be eligible for conditional release under section 4348, it would have expressly so stated in the statute.[90]

---

[88] *Jackson v. Multi-Purpose Criminal Justice Facility*, 700 A.2d 1203 (Del. 1997). *See* Del. Code Ann. tit. 11, § 4346(c).

[89] *Jackson v. Multi-Purpose Criminal Justice Facility*, 700 A.2d at 1205.

[90] *Id.* at 1207 (citing *State v. Skinner*, 632 A.2d 82, 86 (Del. 1993)).

31

### Crosby Decision

In *Crosby*, this Court concluded that the General Assembly had made such an express statement when it enacted the Truth-in-Sentencing legislation. The General Assembly did that in cases of non-violent habitual offenders sentenced to life under section 4214(a), because any sentence imposed under section 4214(a) was made specifically subject to the provisions of section 4381 in the same Truth-in-Sentencing enactment. Thus, section 4381(a) provided that "*all* sentences imposed for *any* offense, other than a life sentence imposed for class A felonies, *may be reduced* by earned good time under the provisions of this section and rules and regulations adopted by the Commissioner of Corrections." Although the General Assembly created classifications for felonies when it adopted the Truth-in-Sentencing Act, it did not reclassify section 4214(a) life sentences for habitual offenders as life sentences for "class A felonies," which are carved out from the "earned good time" provision of section 4381(a).

In *Crosby*, we "examine[d] the amendments that were made to the habitual offender statute as part of the Truth-in-Sentencing Act to ascertain the General Assembly's [then] current intent with regard to a section 4214(a) life sentence."[91] The history of Delaware's habitual offender statute reflects

---

[91] *Crosby v. State*, 824 A.2d 894, 900 (Del. 2003).

32

that the General Assembly drew a distinction between a habitual offender designation under section 4214(a) and an habitual offender status under section 4214(b). In 1970, before the Truth-in-Sentencing Act was passed, a person serving a life sentence under section 4214(a) could receive the benefit of parole, and for that purpose a life sentence would be considered a fixed term of forty-five years. A person serving a life sentence imposed under subsection 4214(b), however, was not eligible for parole.

When Truth-in-Sentencing was enacted, the General Assembly retained the distinction first made in 1970 between habitual offenders who were serving life sentences under section 4214(a) and under section 4214(b), respectively. After the passage of the Truth-in-Sentencing Act, persons sentenced to life as habitual offenders under section 4214(a) were not eligible for release on parole. Such persons were still eligible for conditional release under section 4348, however, because subsection (a) specifically incorporated section 4381 by reference. The General Assembly accomplished its intention to provide for sentence reduction through the accumulation of good time credit by continuing to treat a life sentence

33

imposed under section 4214(a) in the Truth-in-Sentencing Act as a fixed term of 45 years.[92]

In *Crosby*, we determined that, when the Truth-in-Sentencing Act was adopted, the General Assembly intended to treat a person sentenced to life under section 4214(a) differently from persons who received other life sentences,[93] by making that person eligible for conditional release. That intent, we held, was clearly reflected in all of the General Assembly's carefully crafted statutes and amendments. The General Assembly

---

[92] Accordingly, in *Crosby*, the sentencing judge stated that Delaware law equates Crosby's life sentence, as an habitual offender under title 11, section 4214(a) of the Delaware Code, to a fixed term of forty-five years. In fact, Crosby's life sentence was based on the trial judge's belief that Crosby would be "eligible for a significant sentence diminution by earning good time." The SENTAC Benchbook recognized that explicitly:

> Habitual criminal status, is not, per se, a class A offense, but is declared on petition from the Attorney General. If declared under Section 4214(a) may receive a sentence of UP TO LIFE imprisonment at Level V, such sentence being subject to "good time credit" but no other form of diminution or suspension. If declared under section 4214(b), the sentence is LIFE without suspension, probation or any other form of diminution.

Delaware Sentencing Accountability Commission Benchbook 21 (2003). Therefore, the sentencing judge concluded that the availability of earning good time credit meant that Crosby would be eligible for conditional release before the expiration of the sentence, *i.e.*, before the end of Crosby's natural life. The sentencing judge stated that "was a factor I took into account."

[93] At the time *Crosby* was decided, a life sentence under section 4214(a) of the habitual offender statute was unique in comparison to the General Assembly's statutory scheme for other life sentences. It differed by express statutory language from any of the following types of life sentences: "A life sentence for murder in the first degree is 'life without benefit of probation or parole or any other reduction.' A life sentence for a class A felony is not subject to the statute authorizing the award of good time. A life sentence for a three-time violent offender is not subject to the probation or parole of Title 11, Chapter 43, which includes § 4381."

34

accomplished that intent by not repealing section 4346(c) and by continuing to treat a life sentence for an habitual offender under section 4214(a) as a fixed term of forty-five years under section 4346(c). Therefore, in *Crosby* we held that a person sentenced to life as an habitual offender pursuant to section 4214(a) is to be "considered as having been sentenced to a fixed term of 45 years," and qualifies for conditional release pursuant to section 4348, based upon good time credits earned pursuant to section 4381.[94]

Following our decision in *Crosby*, the Attorney General's Office asked the General Assembly to change the law.[95] Even though less than 5% of criminal appeals are reversed by this Court, such requests have become a routine practice.[96] The habitual offender provisions that were originally enacted in section 4214(a) as part of the Truth-in-Sentencing Act and construed in *Crosby* were amended in 2004. Those 2004 amendments to

---

[94] *Crosby v. State*, 824 A.2d 894, 900-02 (Del. 2003) (citations omitted).

[95] The Committee Findings of the House of Representatives state:

> A representative from the Attorney General's office explained that there has been ambiguity in regards to a sentence of life in prison. In the past, life in prison could mean 45 years and not an entire natural life in prison. He stated that this bill makes it clear that a life sentence means that the individual will be incarcerated for the rest of their natural life and will not have the option of parole or any reduction in time served.

[96] The percentage of criminal appeals reversed by the Delaware Supreme Court are set forth each year in the Annual Statement Report of the Delaware Judiciary. For the past few years, the reversal rates in criminal appeals were:  3.4% (2004); 3.8% (2003); and 4.9% (2002).

35

section 4214(a) are not an issue in this appeal, and play no role in our resolution of the issue presented here.

### Broad Statements in Crosby *Caused Confusion*

Because Jackson was sentenced to life with the possibility of parole in accordance with statutes adopted before the 1989 enactment of the Truth-in-Sentencing Act, Jackson's natural life sentences were not affected by that legislation. Crosby, however, was sentenced to life under section 4214(a) of the Truth-in-Sentencing legislation. Unfortunately, in explaining how the Truth-in-Sentencing statute operated in Crosby's case, this Court discussed pre-Truth-in-Sentencing aspects of our *Jackson* opinion in terms that were unnecessary to our holding in *Crosby*.

Our decisions in *Crosby* and *Jackson* both involved an application of the good time credit statute, but to different types of life sentences: in *Jackson*, a life sentence for specific *pre-1990 violent* crimes and in *Crosby*, a life sentence for *post-1990 non-violent* habitual offenders. As earlier noted, section 4346(c) treated a life sentence as a fixed term of forty-five years for purposes of determining parole eligibility in cases involving pre-Truth-in-Sentencing *parole eligible* life sentences for violent crimes − i.e. *Jackson*.[97] For those life sentences, good time credit was earned only for the purpose of

---

[97] *Jackson v. Multi-Purpose Criminal Justice Facility*, 700 A.2d 1203 (Del. 1997).

36

accelerating the date of parole eligibility, but *never* for purposes of conditional release.[98]

Section 4346(c), on the other hand, applied to post-Truth-in-Sentencing section 4214(a) life sentences for non-violent habitual offenders, who were never eligible for parole but were eligible for *conditional release* under section 4348 by the sentence reduction provisions of Truth-in-Sentencing Section 4381 – *i.e. Crosby*.[99]  For those life sentences, good time credit was earned only for the purpose of accelerating the date of conditional release, but *never* for purposes of parole.

In *Crosby*, we held that under the Truth-in-Sentencing statute, a life sentence meant a term of forty-five years *but only* for section 4214(a) non-violent habitual offenders.  That was because the new Truth-in-Sentencing section 4381 had been incorporated into the new section 4214(a) provision of the Truth-in-Sentencing statute.  In this statutory setting, the references in *Crosby* to the operation of section 4346 and section 4348 upon the pre-Truth-in-Sentencing life sentences with the possibility of parole for violent crimes, were overbroad and unnecessary to our holding.  That *obiter dicta* in *Crosby* is what caused the initial confusion in this case.

---

[98] *Id.*
[99] *Crosby v. State*, 824 A.2d 894 (Del. 2003).

When *Jackson* was decided in 1997, we stated that section 4348 did not apply to *any* life sentence. That statement was also overbroad. In *Jackson*, we should have more accurately stated that section 4348 did not apply to any life sentence with the possibility of parole that was *imposed before the effective date of Truth-in-Sentencing*. That qualification is important, because the Truth-in-Sentencing statute did make the conditional release provisions in section 4348 applicable to a life sentence imposed after 1990 under section 4214(a). Thus, "to the extent" we stated that *Jackson* was overruled by *Crosby*, it was only to the extent that the unqualified reference in *Jackson* to "*any* life sentence" was overbroad and was not limited to the issue presented by *Jackson*: pre-Truth-in-Sentencing life sentences with the possibility of parole.

### *Jackson Controls Evans*

We have concluded that the cases of *Jackson* and *Crosby* were both decided correctly. We have also determined that *Evans* is controlled by *Jackson* rather than *Crosby*. Evans' life sentence was – like Jackson's life sentence – a natural life sentence with the possibility of parole. Evans' life sentence was not – like Crosby's life sentence – equivalent to a fixed term of forty-five years.

38

In deciding to reconsider this matter, we asked the State to produce copies of Evans' records at the Department of Correction. Evans' records confirm that his sentence was for life with the possibility of parole. When Evans was originally sentenced, his records at the Department of Correction read: sentence – life; release – death; and parole eligibility – eleven years five months nine days.

The Department of Correction records reflect that Evans' status has always been consistent with our interpretation of the applicable sentencing statutes in *Jackson*. Evans' release date was death, *unless* he was granted parole. For purposes of *parole eligibility only*, Evans' life sentence was computed as a term of forty-five years. Evans was eligible for parole after serving one third of forty-five years and could accelerate his parole eligibility date by earning good time credit.[100]

When Evans was sentenced to life with the possibility of parole, the statutory sentencing system did not permit Evans to be released prior to his death—unless parole was granted. Similarly, good time credits only applied to Evans' natural life sentence for purposes of accelerating Evans' parole eligibility date. Accordingly, we hold that Evans – like Jackson – is not

---

[100] *Stirparo v. State*, 297 A.2d 406 (Del. Super. Ct. 1972).

39

eligible for conditional release and must remain incarcerated until his death, unless he is granted parole.[101]

### *Conclusion*

The opinion issued by this Court on November 23, 2004 is withdrawn and shall have no force or effect. House Bill No. 31 is unconstitutional in its entirety. The judgment of the Superior Court in Evans' case is affirmed.

---

[101] *Jackson v. Multi-Purpose Criminal Justice Facility*, 700 A.2d 1203 (Del. 1997).

IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DERRICK FULLER, | § | No. 38, 2004 |
| | § | |
| Defendant Below, | § | Court Below: Superior Court |
| Appellant, | § | of the State of Delaware in |
| | § | and for New Castle County |
| | § | |
| STATE OF DELAWARE | § | Cr. ID No. 0305001419 |
| | § | |
| Plaintiff Below, | § | |
| Appellee | § | |

Submitted: September 8, 2004
Decided: October 29, 2004

Before **HOLLAND, JACOBS** and **RIDGELY**, Justices.

On appeal from the Superior Court.  **AFFIRMED** in part, **VACATED** in part, and **REMANDED.**

Bernard J. O'Donnell, Esq., Wilmington, Delaware for Appellant.

Timothy J. Donovan, Jr., Esq., Department of Justice, Wilmington, Delaware for Appellee.

**RIDGELY**, Justice

Derrick Fuller appeals his convictions by a jury and sentences imposed by the Superior Court for the offenses of possession with the intent to deliver cocaine,[1] possession of drug paraphernalia[2] and maintaining a vehicle for the purpose of keeping a controlled substance.[3] Fuller was acquitted on the charge of trafficking in cocaine.[4] The trial judge sentenced Fuller to five years of imprisonment, the maximum incarceration available.

Fuller has raised five issues in this appeal. He contends that the trial judge abused his discretion by: 1) denying his motion for a mistrial after the trial judge struck certain testimony, 2) admitting statements of skepticism by a police officer during the course of Fuller's statement to the police, 3) limiting cross-examination of a police officer on his intention to arrest Fuller's brother, 4) instructing the jury on joint possession of a controlled substance, and 5) enhancing Fuller's sentence because of his brother's perjury at the trial. We find no basis to reverse the convictions in this case. We do conclude that there is insufficient competent evidence in the present record to support any finding that Fuller suborned the perjury by his brother. We therefore vacate Fuller's sentences and remand for resentencing.

---

[1]    DEL. CODE ANN. 16, § 4751 (2004).

[2]    *Id.* at § 4771.

[3]    *Id.* at § 4755(a)(5).

[4]    *Id.* at § 4753A(a)(2)(a).

2

I.

On the afternoon of May 2, 2003, Fuller's vehicle was stopped by the Wilmington Police Department. Fuller was the driver and owner of the vehicle. The police removed Fuller and a passenger from the vehicle and then searched it. The police found two plastic bags containing 20.32 grams of crack cocaine hidden underneath the carpeted floormat in the trunk of the vehicle. The police also found $114 in Fuller's pant pockets. The police then searched Fuller's apartment and seized $800 from his bedroom.

At trial, the State's key witness was Officer David Rosenblum, the chief investigating officer. Officer Rosenblum testified to the events leading up to the stop, the search of Fuller's vehicle, as well as statements made by Fuller. Ean Fuller, Derrick Fuller's younger brother, testified for the defense that he was living with his brother at the time of the arrest and that he had hidden the cocaine in Derrick Fuller's vehicle without his knowledge. Fuller, who did not testify at his trial, was acquitted of the trafficking in cocaine charge, but was convicted of possession of cocaine, maintaining a vehicle for the purpose of keeping cocaine and possession of drug paraphernalia.

After his trial testimony, Ean was arrested on the same drug charges previously filed against his brother. Ultimately those charges were dropped and Ean pled guilty

3

instead to committing perjury at Fuller's trial.  He did not implicate Fuller or anyone else in the subornation of his perjury.

At Fuller's sentencing the prosecutor argued several aggravating factors, and also asserted that Fuller "knew his brother was going to lie."[5]    Fuller made no statements about his brother's perjury on the instruction of his counsel.  Although Fuller did not testify, the trial judge found that Fuller "at the very least, would have been aware of what his younger brother was doing" and "at the very least, allowed his brother to [commit perjury]."[6]  The trial judge expressly indicated that it was Ean's perjury that justified the sentence he imposed, and that Fuller's sentence would not have been as severe if the trial judge were not allowed to consider Ean's perjured testimony.[7]

II.

We will address the issues raised in the order Fuller has presented them.

---

[5]     Sentencing Transcript of Derrick Fuller on January 9, 2004 at 13.

[6]     *Id.* at 13.

[7]     *Id.* at *24*  The trial judge stated:

> If the Court did not take that [Ean's perjury] into consideration, the Court would impose an enhanced sentence based on Mr. Fuller's background and, specifically, his serious history of criminal convictions.  But so the record is clear, in case it has to be revisited, if the Court were not allowed to take into consideration this situation involving Ean Fuller's perjury on Derrick Fuller's behalf, then the sentence would not be as severe as the one the Court is going to impose.

4

A.

Fuller argues that the trial judge abused his discretion by denying his motion

for a mistrial after Officer Rosenblum made a non-responsive prejudicial remark on

direct examination by the State.  Officer Rosenblum testified that Fuller was arrested

at gunpoint because the police received information that Fuller was "probably armed."

Defense counsel objected to this statement.  The trial judge immediately and *sua*

*sponte* instructed the jury to disregard Officer Rosenblum's remark, and even told the

jury there was no reason to believe it.[8]  Fuller moved for a mistrial, which was denied.

Fuller argues that a mistrial should have been granted because Officer Rosenblum's

testimony was unfairly prejudicial and deprived him of a fair trial.          W e

review for abuse of discretion a trial judge's decision to deny a motion for a mistrial.[9]

---

[8]     Transcript of Trial Proceedings on October 7, 2003 at 105.  The trial judge instructed:

Ladies and gentlemen of the jury, I don't know where this suggestion that the
defendant was probably armed came from.

I've spoken to the attorneys before the case began.  That just comes out of left field.

There's no reason for you to believe that there's some reason why, at that time, the
police thought the defendant was armed and that kind of innuendo is unacceptable
and you are to ignore it.  There is no basis for the police to believe that this
particular defendant was armed.

Now, what they said over the radio, that's one thing, but in terms of now that we're
in a courtroom, was there a reason to believe that the defendant was armed, there
was none.

[9]     *Ashley v. State*, 798 A.2d 1019, 1022 (Del. 2001) (citing *Taylor v. State*, 685 A.2d 349, 350
(Del. 1996)).

5

It is well settled that a mistrial is warranted only if "there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated."[10]  In fact, prejudicial error will normally be cured by the trial judge's instructions to the jury.[11]  Moreover, "[t]he trial judge is in the best position to assess whether a mistrial should be granted, and may exercise his discretion in deciding whether to grant a mistrial. Absent an abuse of that discretion, the appellate court will not disturb the trial judge's decision."[12]

In the present case, we find that defense counsel's objection and the trial judge's instruction to the jury to disregard Officer Rosenblum's statement mitigated the effects of the comment and cured the error.[13]  The jury is presumed to have followed the trial judge's instruction and disregarded Officer Rosenblum's stricken testimony.[14]  Accordingly, we hold that the trial judge properly exercised his

---

[10]    *See Fanning v. Superior Court*, 320 A.2d 343, 345 (Del. 1974).  *See also Dawson v. State*, 637 A.2d 57, 62 (Del. 1994) ("A mistrial is mandated only when there are 'no meaningful and practical alternatives' to that remedy.") (quoting *Bailey v. State*, 521 A.2d 1069, 1077 (Del. 1987)).

[11]    *Dawson,* 637 A.2d at 62 (citing *Sawyer v. State*, 634 A.2d 377, 380 (Del. 1993); *Diaz v. State*, 508 A.2d 861, 866 (Del. 1986)).

[12]    *Bowe v. State*, 514 A.2d 408, 410 (Del. 1986) (citing *Thompson v. State*, 399 A.2d 194, 199 (Del. 1979)).

[13]    *Cf. Boatson v. State*, 457 A.2d 739, 743 (Del. 1983); *Edwards v. State*, 320 A.2d 701, 703 (Del. 1974).

[14]    *Claudio v. State*, 585 A.2d 1278, 1280 (Del. 1991); *Kornbluth v. State*, 580 A.2d 556, 560 (Del. 1990).

6

discretion in deciding that a curative instruction was a meaningful and practical alternative to declaring a mistrial.

B.

Fuller's next argument is that the trial judge erred by admitting Officer Rosenblum's pre-trial comment during questioning of Fuller that showed skepticism regarding Fuller's initial explanation of why the drugs were in his vehicle. At trial Officer Rosenblum testified that following Fuller's arrest and a waiver of his *Miranda*[15] rights, Fuller explained that the drugs actually belonged to a Colombian drug lord who performed work on his vehicle. Officer Rosenblum testified that he had asked Fuller if he wanted to go with that story, and Fuller then shrugged his shoulders and asserted that the cocaine was not his. Defense counsel objected to the admissibility of Officer Rosenblum's skeptical response to Fuller's explanation. The trial judge overruled the objection but nevertheless instructed the jury that Officer Rosenblum's "belief is irrelevant."[16] Citing *Doyle v. Ohio*[17] and *McDonald v. State*,[18]

---

[15]    *Miranda v. Arizona*, 384 U.S. 436 (1966).

[16]    Transcript of Trial Proceedings on October 7, 2003 at 133.

[17]    426 U.S. 610 (1976) (holding that it is unfair and a deprivation of due process to use the defendant's silence to impeach their explanation at trial).

[18]    816 A.2d 750, 753 (Del. 2003) (referencing the well settled principle that a "criminal defendant's silence may not be used against him after he has received governmental assurances through *Miranda* warnings.").

7

Fuller suggests that the trial judge's limiting instruction was not sufficient to address the potential prejudice of Officer Rosenblum's statement and that the officer's statement should not have been admitted because it unfairly subverted Fuller's constitutional right to remain silent.

We review a trial judge's ruling admitting or excluding evidence for abuse of discretion.[19] Here, the trial judge did not abuse his discretion in allowing the jury to hear the complete exchange between Fuller and Officer Rosenblum during the investigation. Moreover, the trial judge cured any prejudice by instructing the jury that Officer Rosenblum's belief was irrelevant and that it was for them to decide what to believe.[20] It is presumed that the jury complied with the trial judge's instruction.[21]

Furthermore, Fuller's reliance on *Doyle* is not persuasive. In *Doyle*, the defendants chose to remain silent upon their arrest and receipt of their *Miranda* warnings.[22] The defendants testified at trial that they had been framed in the drug

---

[19]   *Howard v. State*, 549 A.2d 692, 693 (Del. 1988).

[20]   Transcript of Trial Proceedings on October 7, 2003 at 133.

[21]   *Claudio*, 585 A.2d at 1280; *Kornbluth*, 580 A.2d at 560.

[22]   *Doyle*, 426 U.S. at 613-14.

transactions at issue.[23]  The prosecution impeached the defendant's testimony on

cross-examination as a result of their failure to tell the "frame up" story to the

narcotics agent who arrested them and gave them *Miranda* warnings.[24]  The United

States Supreme Court held that "the use for impeachment purposes of petitioners'

silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due

Process Clause of the Fourteenth Amendment."[25]  In essence, *Doyle* forbids comment

on a defendant's post-Miranda silence.[26]  In this case, however, Fuller waived his

*Miranda* rights and made a statement to Officer Rosenblum.  Therefore, *Doyle* is

inapplicable in the instant case.  Fuller's reliance on *McDonald* is also inapplicable

for the same reasons.

We therefore hold that the trial judge, in conjunction with his limiting

instruction, properly exercised his discretion in permitting Officer Rosenblum to

testify regarding his conversation with Fuller about his explanation of why the drugs

were in his vehicle.

C.

---

[23]     *Id.*

[24]     *Id.*

[25]     *Id.*

[26]     *Doyle*, 426 U.S. at 613-14.

9

Fuller next argues that the trial judge abused his discretion by precluding the defense from cross-examining Officer Rosenblum about his intention to arrest Ean after Ean testified that he, not Fuller, was the possessor of the cocaine. Before Ean testified, defense counsel was informed by the State that the Wilmington Police Department intended to arrest Ean after he testified, presumably on drug charges.[27] Following Ean's testimony, defense counsel called Officer Rosenblum as a witness, at which time the following dialogue took place:

> Q.  Officer Rosenblum, did you learn of Ean Fuller's possible testimony yesterday?
>
> A.  Yes.
>
> Q.  And at that time, did you use your cellphone and other communication devices to call for assisting officers to arrest Ean Fuller after his testimony?
>
> A.  At the request of - -.[28]

The State objected to this line of inquiry before Officer Rosenblum could answer completely. The trial judge sustained the objection, ruling that this line of inquiry was irrelevant, would be an inefficient use of the court's time and would

---

[27]     Transcript of Trial Proceedings on October 7, 2003 at 9-11.

[28]     Transcript of Trial Proceedings on October 7, 2003 at 58.

10

confuse the jury.[29]   The trial judge also instructed the jury to disregard defense counsel's question and the partial answer given by Officer Rosenblum.

Fuller relies on D.R.E. 616,[30] *Snowden v. State*,[31] and *Weber v. State*[32] in arguing that the rejected line of inquiry went toward Officer Rosenblum's bias and interest and was therefore admissible.  Fuller contends that the defense should be permitted to question a police officer concerning his bias, motivation and interest where a police officer is a witness and is prepared to arrest and charge two people for committing an offense, but the State contends that only one person has committed the offense.

---

[29]    Transcript of Trial Proceedings on October 7, 2003 at 59.  The trial judge stated:

> It's too collateral and too amorphous.  It invites a mini trial on who made the decision, what the basis of that decision was.  We can't get into that in front of the jury because it's confusing and an inefficient use of time.  If we don't have this mini trial for why the police attempted to do what they apparently attempted to do, then the jury has to speculate about that.  So, what it winds up is simply being a form of innuendo, and it really is beside the point as to whether the State has proved beyond a reasonable doubt through the presentation of evidence to that effect that the defendant did certain things on certain days.

[30]    D.R.E. Rule 616.  This rule states: "For the purpose of attacking the credibility of a witness, evidence of bias, prejudice or interest of the witness for or against any party to the case is admissible."

[31]    672 A.2d 1017, 1025 (Del. 1996) ("The bias of a witness is subject to exploration at trial and is 'always relevant as discrediting the witness and affecting the weight of his testimony.'").

[32]    457 A.2d 674, 681 (Del. 1983) (requiring that "counsel be permitted to inquire into any acts, relationships, or motives reasonably likely to create bias.").

We find that the defense's proposed line of inquiry was not directed toward any bias on the part of Officer Rosenblum but, rather, sought to elicit a conclusion or an opinion of the police that Ean's admissions were credible. It was for the jury, not Officer Rosenblum, to decide the credibility of the witness. We also note that Ean made a full confession on the witness stand that the drugs were his. Any error in precluding the admission of evidence of Ean's impending arrest in this case was clearly harmless beyond a reasonable doubt.[33] Ean testified to his possession of the drugs and additional evidence of his impending arrest would have amounted to little more than surplusage.[34]

D.

Fuller next argues that the trial judge erred in instructing the jury on the concept of joint possession of a narcotic substance. The trial judge instructed the jury that "[t]wo or more people may have joint possession of a narcotic drug, if jointly and knowingly, they have dominion, control and possession ... ."[35] Fuller argues that there was insufficient evidence to find joint control in this case, and that such an instruction invited unnecessary jury confusion. As evidence of such confusion, Fuller

---

[33]    *Chapman v. California,* 386 U.S. 18 (1967).

[34]    *Reynolds v. State*, 424 A.2d 6, 7 (Del. 1980).

[35]    Transcript of Trial Proceedings on October 7, 2003 at 149-50.

12

points to the fact that the jury acquitted him on the charge of trafficking in cocaine but convicted him for possession of the very same cocaine.

"The decision whether to give a particular jury instruction lies in the sound discretion of the trial court, and will not be reversed absent an abuse of discretion."[36] "A trial court's charge to the jury will not serve as grounds for reversible error if it is 'reasonably informative and not misleading, judged by common practices and standards of verbal communication.'"[37]

We hold that the jury instruction on joint possession was supported by the evidence for two reasons. First, there was Fuller's initial statement to the police that the cocaine belonged to a Colombian drug lord who had performed work on his vehicle. Although Fuller denied ownership of the drugs, it can reasonably be inferred from this statement that Fuller knew that the cocaine was in his vehicle and hence in his possession. Second, a rational fact finder could accept Ean's testimony that the drugs partly belonged to Ean yet also rejected Ean's testimony that Fuller had no knowledge of the drugs. Thus, there was sufficient evidence for the trial judge to instruct the jury on the concept of joint possession.

---

[36]     *Price v. State*, No. 367, 1995, 1996 Del. LEXIS 318, at *5 (Del. Aug. 19, 1996) (citing *Sheeran v. State*, 526 A.2d 886, 893 (Del. 1987)).

[37]     *Probst v. State*, 547 A.2d 114, 119 (Del. 1988) (citing *Baker v. Reid*, 57 A.2d 103, 109 (Del. 1947) (quoting *Flamer v. State*, 490 A.2d 104, 128 (Del. 1984)).

We also reject Fuller's contention that the joint possession jury instruction confused the jury, thereby resulting in an inconsistent verdict. The fact that the jury acquitted him of trafficking in cocaine but convicted him for possession of the very same cocaine does not compel the conclusion of jury confusion. After a careful review of the record, we are satisfied that there was sufficient evidence to support Fuller's convictions and that his acquittal on the charge of trafficking in cocaine is explainable simply as a matter of jury lenity.[38] Moreover, jury verdicts are insulated from judicial review on the basis of inconsistencies.[39]

E.

We now turn to the sentencing issue. The trial judge imposed a sentence of five years imprisonment for Fuller's three convictions on the ground that Fuller at a minimum knew of his brother's false testimony and allowed it at his trial.[40] Fuller contends that the trial judge erred by enhancing his sentence because the trial judge impermissibly considered Ean's perjured testimony as a determinative sentencing

---

[38]    *Tilden v. State*, 513 A.2d 1302, 1307 (Del. 1986).

[39]    *United States v. Powell*, 469 U.S. 57 (1984).

[40]    *See supra* note 5 and accompanying text. We note that the trial judge made no conclusion that Fuller's lawyer knowingly participated in an obstruction of justice.

14

factor, that Fuller had a Fifth Amendment right to remain silent, and that there was no evidence presented that Fuller had suborned perjury or committed fraud.[41]

We begin our analysis by noting that a trial judge is permitted to consider a defendant's perjury or obstruction of justice as a sentencing factor.[42] The question before us is whether there was competent evidence, and whether the requisite findings appear in the present record, to support the trial judge's decision to enhance Fuller's sentence on the basis that Ean committed perjury while testifying at Fuller's trial. Absent any evidence in the record to link Fuller to the commission of that offense, we must answer this question in the negative.

With certain exceptions involving mandatory sentences, Delaware has an indeterminate sentencing system. Although there are voluntary sentencing guidelines, the sentencing judge is not bound by them.[43] The sentencing judge need only state his reasons for imposing a sentence outside the guidelines.[44] We review a sentence of a

---

[41]     No conduct is a crime unless defined by the Delaware Criminal Code or another law. "Suborning perjury" is not identified as a crime in the Delaware Criminal Code by that phrase. Our use of the term "suborning perjury" in this opinion is simply a reference to liability for the conduct of another under DEL. CODE ANN. tit. 11, § 271 (2004).

[42]     *See* Jean E. Maess Annotation, *Propriety of Sentencing Judge's Consideration of Defendant's Perjury or Lying in Pleas or Testimony in Present Trial,* 34 A.L.R. 4th 888. (1984).

[43]     *Mayes v. State*, 604 A.2d 839, 845 (Del. 1992).

[44]     DEL. CODE ANN. tit. 11, § 4204(m) (2004).

15

criminal defendant for abuse of discretion.[45]  Our review of a sentence "generally ends upon determination that the sentence is within the statutory limits prescribed by the legislature."[46]  "Thus, in reviewing a sentence within statutory limits, this Court will not find error of law or abuse of discretion unless it is clear from the record that a sentence has been imposed on the basis of demonstrably false information or information lacking a minimal indicia of reliability."[47]  "In reviewing a sentence within the statutory range, this Court will not find error unless it is clear that the sentencing judge relied on impermissible factors or exhibited a closed mind."[48]

The United States Supreme Court has held that commission of perjury or obstruction of justice is a permissible sentencing factor in the federal system after guilt has been resolved.[49]  The trial court must, however, "review the evidence and make independent findings necessary to establish willful impediment to or obstruction of

---

[45]    *See Boo'ze v. State*, No. 331, 2003, 2004 Del. LEXIS 145, at *9 (Del. Jan. 12, 2004).  *See also Fink v. State*, 817 A.2d 781, 790 (Del. 2003) ("This Court reviews sentencing of a defendant in a criminal case under an abuse of discretion standard.").

[46]    *Boo'ze,* 2004 Del. LEXIS 145, at *9 (citing *Mayes*, 604 A.2d at 843).

[47]    *Id.*

[48]    *Id.* (citing *Fink*, 817 A.2d at 790).

[49]    *United States v. Dunnigan*, 507 U.S. 87 (1993)

16

justice, or an attempt to do the same ... ."[50]     The Supreme Court reasoned that "[t]he perjuring defendant's willingness to frustrate judicial proceedings to avoid criminal liability suggests that the need for incapacitation and retribution is heightened as compared with the defendant charged with the same crime who allows the judicial proceedings to progress without resorting to perjury."[51] In *Dunnigan*, the Supreme Court found that there was ample support for the district court's findings that the defendant committed perjury during his drug prosecution given the numerous witness who contradicted the defendant regarding so many facts on which the defendant could not have possibly been mistaken.[52] The Supreme Court further found that enhancing a defendant's sentence due to a defendant's perjured testimony at trial would not interfere with a defendant's right to testify because a defendant's right to testify does not include the right to commit perjury.[53]

It logically follows and we therefore hold that a defendant has no right to suborn perjury from a witness at his or her trial. Consistent with the United States Supreme Court decision in *Dunnigan*, we also hold that to enhance a defendant's

---

[50]     *Id.* at 95 (citations omitted).

[51]     *Id.* At 97-98.

[52]     *Id.* at 95-96.

[53]     *Dunnigan*, 507 U.S. at 96.

17

sentence by reason of perjury committed by another person at trial, the trial judge must review the evidence and make independent findings necessary to establish willful impediment to or obstruction of justice, or an attempt to do the same through the perjury of another witness.[54] The trial judge must identify on the record at least some specific facts, not just conclusions, showing that the defendant engaged in such conduct.[55] The trial judge must also, at least briefly, explain or it must otherwise be apparent from the record why the subornation of perjury was material.[56]

In this case, the trial judge stated that he would not have enhanced Fuller's sentence to the maximum sentence allowed for the offenses, were it not for Ean pleading guilty to perjury at a separate proceeding. However, Ean's guilty plea to perjury does not establish *per se* that another person suborned his perjury. Nor does the fact that Fuller was convicted notwithstanding Ean's exculpating testimony establish that Fuller suborned perjury.

---

[54] *See Matthews v. United States*, 11 F.3d 583, 587 (6th Cir. 1993). *See also United States v. Sassanelli*, 118 F.3d 495, 500 (6th Cir. 1997) (holding that a trial judge must "make independent findings that the defendant committed perjury" to enhance the defendant's sentence on this ground).

[55] *See* DEL. CODE ANN. tit. 11, § 271 (2004). *Cf. Sassanelli*, 118 F.3d at 501 (holding that in the context of a defendant's perjury "the sentencing judge must identify for the record at least some specific instances of conflicting testimony and specify which portions of the defendant's testimony he finds materially perjurious.").

[56] *United States v. Spears*, 49 F.3d 1136, 1143 (6th Cir. 1995) (citations omitted). In the present case, the trial judge did explain his belief that Ean's perjury was the basis for Fuller's acquittal on the trafficking charge.

18

Unlike the facts in *Dunnigan*, the record here shows that Fuller remained silent during his trial. It is well established that no negative inference can be drawn against Fuller for his exercise of his Fifth Amendment right at trial.[57] Nor may any negative inference be drawn against Fuller for the exercise of his Fifth Amendment right at sentencing.[58] The record in this case does not show why the State did not obtain any statement from Ean about his perjury or anyone else's involvement in suborning it. On the other hand, the record does show that the State presented no evidence that Fuller suborned perjury, nor did the trial judge make independent findings from competent evidence in the record to establish that Fuller willfully did so. While it is undisputed that Derrick Fuller and Ean Fuller are brothers, this family tie is not a permissible factor for sentence enhancement.[59]

III.

Accordingly, we **AFFIRM** Fuller's convictions in the Superior Court for possession with the intent to deliver cocaine, possession of drug paraphernalia and maintaining a vehicle for the purpose of keeping a controlled substance. We

---

[57]    *Griffin v. California*, 380 U.S. 609 (1965).

[58]    *Mitchell v. United States*, 526 U.S. 314 (1999).

[59]    *Cf.* United States Sentencing Commission, Sentencing Guideline Manual § 5H1.4 (stating that family ties is an impermissible factor for departing from federal sentencing guidelines).

19

**VACATE** Fuller's sentences[60] and **REMAND** for resentencing in conformance with this opinion.[61] Jurisdiction is not retained.

---

[60]     Because we have vacated the sentence for the reasons we have stated, we need not address in this appeal Fuller's argument that he was entitled to a jury determination that he suborned or acquiesced in perjury under *Blakely v. Washington*, 124 S. Ct. 2531 (2004).

[61]     We leave for the trial judge any determination in the first instance of whether he should recuse himself under *Los v. Los*, 595 A.2d 381 (Del. 1991) so that another judge may sentence Fuller.

20